## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE TOSCANO, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>KONINKLIJKE PHILIPS N.V., PHILIPS NORTH AMERICA LLC, and PHILIPS RS NORTH AMERICA LLC,<br><br>Defendants. | **Case No.** 2:21-cv-1685<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Jose Toscano ("Plaintiff"), individually and on behalf of all others similarly situated, for his complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.    NATURE OF THE ACTION

1.      Defendants manufacture and sell a variety of products that are intended to assist people with breathing. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("Bi-Level PAP") machines that are commonly used to treat sleep apnea, and mechanical ventilators that treat respiratory failure. In general, each of these devices express air into patients' airways. CPAP and Bi-Level PAP machines are intended for daily use, and ventilators are used continuously while needed. These devices are designed to provide medical benefits to those who purchase and use them.

2.    On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the polyester-based polyurethane foam ("PE-PUR Foam") used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.    On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam,[1] because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[2] Specifically, the PE-PUR Foam may emit volatile organic compounds ("VOCs") that are carcinogenic and may adversely affect organs if inhaled or ingested. Philips further disclosed in its Recall Notice that "these issues can result in serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[3]

4.    The use of a polyester-based polyurethane by Philips for its breathing machines was an unsuitable choice of material for the application.

5.    Polyurethane is a polymer composed of organic units joined by carbamate (urethane) links. Polyurethanes are produced by reacting an isocyanate containing two or more isocyanate groups per molecule $(R-(N=C=O)_n)$ with a polyol containing on average two or more

---

[1] These include the following models: E30; DreamStation ASV; DreamStation ST, AVAPS; SystemOne ASV4; C Series ASV, S/T, AVAPs; OmniLab Advanced Plus; SystemOne (Q Series); DreamStation CPAP, Auto CPAP, BiPAP; DreamStation Go CPAP, APAP; Dorma 400, 500 CPAP; REMStar SE Auto CPAP; Trilogy 100 and 200; Garbin Plus, Aeris, LifeVent; A-Series BiPAP Hybrid A30; A-Series BiPAP V30 Auto; A-Series BiPAP A40; and A-Series BiPAP A30 (collectively, "Recalled Devices").

[2] *See* Philips Recall Notice attached hereto as Exhibit "A."

[3] *Id.*

hydroxyl (O-H) groups per molecule in the presence of a catalyst or by activation with ultraviolet light.

6.     The health effects of isocyanate exposure include, among other things, irritation of skin and mucous membranes, chest tightness, and difficult breathing. Isocyanates include compounds classified as potential human carcinogens and known to cause cancer in animals. The additional known hazardous effects of isocyanate exposures are occupational asthma and other lung problems, as well as irritation of the eyes, nose, throat, and skin.

7.     Polyurethanes, especially those made using aromatic isocyanates, contain chromophores that interact with light. When polyurethane foam, which is made using aromatic isocyanates, is exposed to visible light, it discolors, turning off-white to yellow to reddish brown, and finally to black.

8.     Degradation of polyurethane can result in the material becoming hard and friable, which can cause particles to be propelled by air movement. Degradation of the polyester polyurethane into volatile components (which may include hydrogen cyanide, and other toxic components) can result in ingestion into the airways, absorption on skin and tissue, and/or entry into the bloodstream. If depolymerization of the urethane occurs, isocyanate can evolve, which is toxic and potentially carcinogenic. Additionally, amines, glycols, and phosphate may produce additional risks.

9.     Philips' ventilators and CPAP/Bi-Level PAP machines may involve use that results in a high-humidity, elevated-temperature (95-110°F) application complicated by the presence of bacteria and potential fungal growth. Polyester polyurethane is particularly sensitive to degradation from heat, oxygen (ozone), sunlight (ultraviolet), moisture, microbial, and fungal attack. The properties of polyester polyurethanes have been well known and have been well

documented and readily available in the scientific literature for many years well before Philips started manufacturing the Recalled Devices.

10.    The selection of polyester polyurethane by Philips for application in its ventilator and CPAP/Bi-Level PAP machines was highly inappropriate in that it breached the relevant standard of care because all of health and safety risks set forth in the recall were known before the sale of any of the Recalled Devices and imminently foreseeable, all the while safe alternatives were available.

11.    Furthermore, Philips knew or should have known about these very substantial and material health risks associated with the degradation of polyester polyurethane before any of these machines were sold and nonetheless used the material because it was expedient. In so doing, Defendants knowingly subordinated the health interests of their customers to their own financial gain.

12.    Defendants now report in the recall that "based on testing there are possible risks to users related to this type of foam," and that "Philips has received reports of possible patient impact due to foam degradation."

13.    Plaintiff is informed and believes that these "risks" and certainty of degradation were known before any of the Recalled Devices were sold, because the properties of polyester polyurethane and likelihood of degradation in this application were known to the industry, were common knowledge to polymer experts and were readily available and known to Defendants before the machines went to market.

14.    In that context, Defendants defrauded Plaintiff and the Class and Subclass at the time and place of each sale by failing to disclose the risk of harm – risks which were known or should have been known before the Recalled Devices were sold. Defendants' awareness of the properties of polyester polyurethane in this application, namely, high temperature, high moisture

and susceptibility for fungi and microbes would lead to degradation and the inevitable and known health risks, required that Defendants disclose these risks before every sale of the products.

15.    Upon information and belief, it is highly unlikely that any person would have purchased, leased or used these products had the Defendants disclosed the health risks associated with the products to consumers prior to the sale, lease or use of the products.

16.    The failure to disclose the known risks also constituted an unfair business practice in that it was unfair and fraudulent to consumers and uniformly impacted and damaged Plaintiff and all Class and Subclass members who would not have otherwise purchased, leased or used the Recalled Devices.

17.    Similarly, the universal warranty made by Defendants promising that the Recalled Devices would be "free from defects of workmanship and materials" was false, misleading and unlawful, and therefore Defendants breached the warranties, express and implied, by so warrantying these products.

18.    Consumers who used the Recalled Devices have complained about black particles in their machines for several years. Philips, however, did not warn the public or its customers about these hazards until late April 2021, and did not recall the Recalled Devices until June 14, 2021.

19.    Philips has no concrete timeline for replacing or repairing the Recalled Devices.

20.    The recall of the Recalled Devices coincided with the launch of Defendants' next generation of products, which purportedly do not suffer from the same PE-PUR Foam issues. Philips has offered to its customers—many of whom need and rely on the Recalled Devices—two options. One is to purchase or lease a newer model of Philips, thus providing Defendants with further profits arising from their own wrongdoing, while the other is for the consumer to wait an undetermined period of time for a replacement device from Philips, which is not proven to be safe or effective.

21.     Plaintiff brings this Class Action Complaint to represent a class and subclass of similarly situated persons defined below, who purchased, leased, or used the defective Recalled Devices, and to obtain damages for the cost of replacement and/or repair, assuming repair is possible, of the machines and associated accessories, and for medical monitoring for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

## II.    PARTIES

### A.    PLAINTIFF

22.     Plaintiff Jose Toscano resides in New Fairfield, Connecticut. He was diagnosed with sleep apnea in 2011 for which he purchased two (2) recalled CPAP devices manufactured by Defendants: (a) a DreamStation CPAP device purchased in or about 2015; and (b) a DreamStation CPAP device purchased in or about 2020. Plaintiff would not have purchased these devices if he had known they were defective and included an unsuitable polyurethane foam which exudes a potentially carcinogenic by-product and other material hazardous to his health.

23.     In response to the recall, Plaintiff Toscano has stopped using his recalled CPAP device. As a result, Plaintiff suffers sleep deprivation and exhaustion since his sleep apnea causes him to awaken gasping for breath. Mr. Toscano wants a replacement device that is safe, effective, and non-defective, and as with all of the Plaintiffs, he seeks the economic losses associated with any costs spent on a replacement device and accessories, costs for ongoing medical monitoring, and all other appropriate damages for all the injuries suffered as a result of the defective Recalled Devices.

24.     The use of a breathing machine is necessary for Plaintiff's health given his medical condition.

25.    Plaintiff demands appropriate economic damages he has incurred or will incur, and compensation for what he has suffered or will suffer as a result of purchasing and using his defective recalled DreamStation devices.

## B.    DEFENDANTS

26.    Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS.[4] Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[5]

27.    Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

28.    Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[6]

---

[4] Philips 2020 annual filing with the SEC, fn. 8,
https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed June 30, 2021).

[5] Philips 2020 annual filing with the SEC,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed June 30, 2021).

[6] Philips announces completion of tender offer to acquire Respironics, WEB WIRE,
https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 27, 2021).

29.     Reference to "Philips," "Defendant," or "Defendants" refers to each and every Defendant individually and collectively.

### III.    JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class and Subclass who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

31.     This Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District. Moreover, Defendant Philips RS has its principal place of business in the forum State. Defendants Philips RS and Philips NA are controlled by their parent Royal Philips. Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in the forum State. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

32.     Venue is proper in this District because Defendants conduct substantial business in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendants caused harm to Class members residing in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     CPAP MACHINES, BI-LEVEL PAP MACHINES, AND VENTILATORS TREAT SERIOUS CONDITIONS.

33.     Sleep apnea is a sleeping disorder in which breathing is disturbed temporarily during sleep. Breathing may stop or become very shallow. This may be associated with fatigue, daytime sleepiness, interrupted sleep, or snoring, among other symptoms. Serious cases can lead to hypertension, heart attack, or stroke, among other medical ailments.

34.     CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose and/or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea.

35.     Other therapies to treat sleep apnea include Bi-Level PAP therapy and Automatic Positive Airway Pressure ("APAP"). Bi-Level PAP machines provide two different pressure settings, one for inhalation and one for exhalation.

36.     Patients who use CPAP or Bi-Level PAP machines typically use them every day when they sleep. Symptoms may return quickly if therapy is discontinued.

37.     Respiratory failure is a condition in which a patient has difficulty breathing or getting enough oxygen into the blood. Many underlying conditions can cause respiratory failure, including physical trauma, sepsis, pneumonia, COVID-19, and drug abuse. Respiratory failure can be fatal.

38.     Mechanical ventilators, usually called "ventilators," are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows.

Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. The COVID-19 crisis has led to a significant increase in the demand for ventilators in the United States and worldwide.

**B.    PHILIPS RECALLED ITS PRODUCTS DUE TO SERIOUS HEALTH HAZARDS FROM THE FOAM THAT IT UTILIZED.**

39.    Philips manufactures and sells CPAP machines, Bi-Level PAP machines, and ventilators, among other products. According to Philips' 2020 Annual Report, Sleep & Respiratory Care constituted approximately 49% of Philips's total sales in its Connected Care line of business, which in turn accounted for 28% of Philips's overall sales of about €19.535 billion.

40.    Philips' flagship CPAP/Bi-Level PAP machine product family is known as the "DreamStation" family line, which includes the original DreamStation, launched in October 2015, and the DreamStation Go (a travel version). Philips sells DreamStation products through its subsidiary Respironics, that Philips acquired in 2008.

41.    Many of Philips' CPAP and Bi-Level PAP machines and ventilators contain PE-PUR Foam for sound abatement. By design of these machines, air passes through this foam before it is pumped into the patient's airway.

42.    On April 13, 2021, Philips announced that it was launching the DreamStation 2, the next-generation machine in its DreamStation product family.

43.    Less than two weeks later, on April 26, 2021, Philips announced the recall and, in the same release, shockingly started pushing consumers to purchase its latest generation device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone**, and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP

platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.

44.     On June 14, 2021, Philips then issued a further statement:

To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.

45.     Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family." Philips elaborated:

Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification* advises patients and customers to take the following actions:

For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.*

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations,

and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.*

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.

46.    On the same day, Philips provided additional information in an announcement entitled "Clinical information for physicians," which explained that the foam breakdown "may lead to patient harm and impact clinical care."

While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

47.    The announcement by Philips detailed two types of hazards from the PE-PUR Foam in the devices. First, the announcement described dangers due to foam degradation exposure:

**Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.

The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

- Toluene Diamine [("TDA")]

- Toluene Diisocyanate [("TDI")]

- Diethylene glycol [("DEG")]

48.     The European Union considers Toluene Diisocyanate "highly toxic" and has concluded that Toluene Diamine "cannot be considered safe for use" even as a hair dye.

49.     Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."

50.     The second hazard is the possibility of VOCs, that is, chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)

51.     Philips admitted that the risks of these VOCs include that they "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness,    irritation    (eyes,    nose,    respiratory    tract,    skin),    hypersensitivity,

nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."

52.     Although Philips did not disclose these health risks until June 2021, Philips has known about these health risks for a long time. For example, customers have complained to Philips about black particles in their machines for several years as evidenced by forum posts and statements from those that follow the industry. In addition, had Defendants conducted adequate research before selecting PE-PUR Foam for use in its Recalled Devices, they should have chosen an alternative material for the application.

C.     **PHILIPS HAS NO ACCEPTABLE PLAN TO REPLACE RECALLED DEVICES.**

53.     In a press release issued on September 1, 2021, Philips indicated it had received authorization from the FDA to "rework" recalled first-generation DreamStation CPAP devices, including the replacement of PE-PUR Foam in the Recalled Devices. However, it is unknown what the timeline for that process is. Further, it is unknown what Philips is doing with regard to replacement of the foam in the Recalled Devices that are returned to Philips or in the devices it is "reworking." And, it is unknown when, or if ever, Philips will be able to provide its customers with suitable, safe and effective devices.

54.     There is also a general shortage of available replacement machines.

55.     But patients need to use their machines every day, or else their symptoms—which can be severe and life-altering—may return.

56.     As a result, the recall by Philips leaves patients without proven safe and effective, free options. Patients may buy Philips' next-generation product or a competitor's product—at full price, if such products are available, or await an unknown period of time to receive a safe and effective replacement device from Philips. Even if Philips sends patients a replacement device, it

is unknown whether the replacement device is safe and effective, nor is there information about what cost a patient may be asked to bear to obtain a replacement device.

57.     Pursuant to the statements issued by Philips that are set forth above, Philips has admitted that the Recalled Devices are defective and unsafe. The Recalled Devices are effectively worthless and/or have far less value, if any, than what customers paid and would not have been purchased by patients if they were informed of the defect at the time of sale.

58.     Plaintiff and the Class and Subclass members have all suffered economic damages as a result of their purchase or lease of the Recalled Devices in an amount equal to the purchase or lease price of their Recalled Devices and/or the cost of a safe and effective replacement machine.

## V.     CLASS ALLEGATIONS

59.     Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3). Specifically, the Classes that Plaintiff seeks to represent consists of the following:

> **NATIONWIDE CLASS**: All persons in the United States who purchased, leased or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

> **CONNECTICUT SUBCLASS**: All persons who were or are citizens of the State of Connecticut who purchased, leased or used a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

60.     Excluded from the Class and Subclass are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (d) persons whose

claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiff and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

61.    Plaintiff reserves the right to redefine the Class and Subclass prior to class certification.

62.    The rights of each member of the Class and Subclass were violated in a similar fashion based upon Defendants' uniform actions.

63.    This action has been brought and may be properly maintained as a class action for the following reasons:

64.    **Numerosity (Rule 23(a)(1))**. The Class and Subclass are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclass, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

65.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

- whether Defendants owed a duty of care to Plaintiff and the Class and Subclass;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions;

- whether Defendants were unjustly enriched by the sale of the Recalled Devices;

- whether Plaintiff and the members of the Class and Subclass are entitled to actual, statutory, and punitive damages, and the amount of such damages; and

- whether Defendants should be declared financially responsible for the costs and expenses of the replacement of all Recalled Devices.

These and other questions of law or fact that are common to the members of the Class and Subclass predominate over any questions affecting only individual members of the Class.

66.     **Typicality (Rule 23(a)(3))**. Plaintiff's claims are typical of the claims of the other members of the proposed Class and Subclass. Plaintiff and members of the Class and Subclass (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class and Subclass.

67.     **Adequacy (Rule 23(a)(4))**. Plaintiff's interests are aligned with the Class and Subclass he seeks to represent. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and Subclass. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class and Subclass. Plaintiff has no interest that is antagonistic to those of the Class and Subclass, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Neither Plaintiff nor Plaintiff's counsel have any interest adverse to those of the other members of the Class and Subclass.

68.     **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class and Subclass is impracticable. The prosecution of separate actions by individual members of the Class and Subclass would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclass, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class

treatment will create economies of time, effort, and expense and promote uniform decision-making.

69.     **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

70.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

71.     Plaintiff and the Class and Subclass had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

72.     Neither Plaintiff nor any other members of the Class or Subclass, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiff and members of the Class and Subclass did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

73.     For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff, the Class, and Subclass.

## VII.     FRAUDULENT CONCEALMENT TOLLING OF STATUTES OF LIMITATIONS

74.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class and Subclass.

75.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and members of the Class and Subclass. Plaintiff and the members of the Class and Subclass were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff or members of the Class or Subclass should be tolled.

## VIII.  CAUSES OF ACTION

### COUNT I

### DESIGN DEFECT STRICT LIABILITY
### (on behalf of the Class or, alternatively, the Subclass)

76.     Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth.

77.     The design of the Recalled Devices, including, but not limited to, design and use of the PE-PUR Foam and the placement of the foam within the Recalled Devices, was defective and unreasonably dangerous, causing degradation and inhalation of the PE-PUR Foam, and exposure to materials with toxic and carcinogenic effects.

78.     The design of the Recalled Devices and the PE-PUR Foam rendered the Recalled Devices not reasonably fit, suitable, or safe for their intended purpose.

79.     The dangers of the Recalled Devices outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are other CPAP, Bi-Level PAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions.

80.     Safe, alternative machines from other manufacturers were available that did not suffer from the defect as set forth herein and that did not have an unreasonable risk of harm as with the Recalled Devices and their unsafe PE-PUR Foam.

81.     The risk benefit profile of the Recalled Devices was unreasonable, and should not have been sold in the market.

82.     The Recalled Devices failed to perform in a safe manner as an ordinary consumer of the product would expect.

83.     Plaintiff and the Class and Subclass suffered damages equal to the purchase or lease price of the machines, or the cost of replacing the machines and such other economic damages, the amount of which to be determined at trial.

## COUNT II

### NEGLIGENT DESIGN DEFECT
### (on behalf of the Class or, alternatively, the Subclass)

84.     Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth.

85.     Defendants negligently designed the Recalled Devices. Philips owed Plaintiff and the Class and Subclass a duty to design the Recalled Devices in a reasonable manner. The design of the Recalled Devices, including but not limited to the design of the PE-PUR Foam and the placement of the PE-PUR Foam within the Recalled Devices, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and exposure to materials with toxic and carcinogenic effects.

86.     The design of the Recalled Devices and the PE-PUR Foam rendered the Recalled Devices not reasonably fit, suitable, or safe for their intended purpose.

87.     The dangers of the Recalled Devices outweighed the benefits and rendered the products unreasonably dangerous. Indeed, there are CPAP and Bi-Level PAP devices and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions.

88.     Safer, alternative machines from other manufacturers were available that did not have an unreasonable risk of harm as with the Recalled Devices and their unsafe foam.

89.     The risk benefit profile of the Recalled Devices was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

90.     The Recalled Devices failed to perform in a safe manner as an ordinary consumer would expect.

91.     Plaintiff and the Class and Subclass suffered damages equal to the purchase or lease price of the machines, or the cost of replacing the machines and such other economic damages, the amount of which to be determined at trial.

### COUNT III

### BREACH OF EXPRESS WARRANTY
**(on behalf of the Class or, alternatively, the Subclass)**

92.     Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

93.     Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class and Subclass.

94.     Philips expressly warranted, advertised, and represented to Plaintiff and the Class and Subclass that the Recalled Devices were safe and appropriate for human use.

95.     Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff and the Class and Subclass entered into upon purchasing the Recalled Devices.

96.     Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff and the Class and Subclass. Plaintiff and the Class and Subclass relied

on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

97.     Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

98.     Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

99.     Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class and Subclass that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

100.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

101.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class and Subclass. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class and Subclass at the time of purchase of the Recalled Devices.

102.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

103.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff and members of the Class and Subclass to rely on such representations and omissions.

104.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiff and members of the Class and Subclass reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

105.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff or members of the Class or Subclass.

106.    Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class and Subclass, but failed to do so until now.

107.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class and Subclass have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiff and members of the Class and Subclass did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

108.    Because Defendants were well aware of the defects in materials and failed to disclose the defects, Defendants are barred and estopped from asserting that warranty claims are

barred based upon the warranty period. Plaintiff and all Class and Subclass members were unaware of the defects in materials and could not have reasonably learned or discovered of such defects.

109.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach. Defendants warranted the Recalled Devices shall be free from defects of workmanship and materials and will perform in accordance with the product specifications.

## COUNT IV

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
(on behalf of the Class or, alternatively, the Subclass)

110.    Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth.

111.    Philips are merchants engaging in the sale of goods to Plaintiff and the Class and Subclass.

112.    There was a sale of goods from Philips to Plaintiff and the Class and Subclass.

113.    At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiff and the Class and Subclass, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiff and the Class and Subclass relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

114.    Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and

omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

115.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

116.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

117.    Privity exists because Philips impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

118.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

119.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

## COUNT V

### FRAUDULENT MISREPRESENTATION
### (on behalf of the Nationwide Class or, alternatively, the Subclass)

120.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

121.    Philips failed to advise Plaintiff and the Class and Subclass that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiff and the Class and Subclass that the Recalled Devices were safe for human use.

122.    Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class and Subclass to purchase the Recalled Devices.

123.    Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class and Subclass.

124.    Plaintiff and the Class and Subclass did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiff's and the Class' and Subclass' reliance on Philips' omissions and misrepresentations was justifiable.

125.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

126.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VI

### FRAUD BY OMISSION
### (on behalf of Nationwide Class or, alternatively, the Subclass)

127.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

128.    Philips concealed from and failed to disclose to Plaintiff and the Class and Subclass that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

129.    Philips was under a duty to disclose to Plaintiff and the Class and Subclass the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiff and the Class and Subclass could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

130.    The facts concealed or not disclosed by Philips to Plaintiff and the Class and Subclass were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

131.    Plaintiff and the Class and Subclass justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

132.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known

of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

133.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT VII

### NEGLIGENT MISREPRESENTATION
**(on behalf of the Nationwide Class or, alternatively, the Subclass)**

134.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

135.    Philips had a duty to Plaintiff and the Class and Subclass to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

136.    Philips breached its duty to Plaintiff and the Class and Subclass by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class and Subclass that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

137.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

138.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class and Subclass have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

139.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

**COUNT VIII**

**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class or, alternatively, the Subclass)**

140.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

141.    Plaintiff and the Class and Subclass conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

142.    Philips either knew or should have known that the payments rendered by Plaintiff and the Class and Subclass were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

143.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the Class and Subclass.

144.    Plaintiff and the Class and Subclass are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

145.    Plaintiff and the Class and Subclass seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## COUNT IX

### Connecticut Unfair Trade Practices Act
### Conn. Gen. Stat. §§ 42-110a, *et seq.*
### (on behalf of the Nationwide Class or, alternatively, the Subclass)

146.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

147.    The Connecticut Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110(b)(a).

148.    Defendants participated in unfair or deceptive trade practices that violated the Connecticut Unfair Trade Practices Act as described herein. By concealing the true risks of the Recalled Devices, Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale the Recalled Devices. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Devices in the course of their business.

149.    Defendants engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or lease of the Recalled Devices.

150.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing and leasing public, and imposed a serious safety risk on the public.

151.    Defendants knew that the risks inherent in the Recalled Devices made them not suitable for their intended use.

152.    Defendants knew or should have known that their conduct violated the Connecticut Unfair Trade Practices Act.

153.    Had Plaintiff, the Class and Subclass members known the truth about the Recalled Devices, they would not have purchased, leased or used the Recalled Devices. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

154.    Defendants owed Plaintiff, the Class and Subclass members a duty to disclose the truth about the Recalled Devices because Defendants: (a) possessed exclusive, specific and superior knowledge of the true risks of the Recalled Devices; (b) intentionally concealed the foregoing from Plaintiff, the Class and Subclass members; and/or (c) made incomplete representations regarding the Recalled Devices, while purposefully withholding material facts from Plaintiff, the Class and Subclass members that contradicted these representations.

155.    Plaintiff, the Class and Subclass members suffered monetary damages as a result of Defendants' conduct.

156.    Defendants' violations present a continuing risk to Plaintiff, the Class and Subclass members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

157.    Defendants are liable to Plaintiff, the Class and Subclass members for actual damages, treble damages, equitable relief, attorneys' fees and costs. Conn. Gen. Stat. § 42-110g(a), (d).

## COUNT X

**MEDICAL MONITORING**
**(on behalf of the Subclass, except for Class Members**
**who purchased a Recalled Device for business use only)**

158.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

159.     At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

160.     Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

161.     When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

162.     The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

163.     The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence

of harmful chemicals including: TDA, TDI, and DEG.[7] TDI is a powerful irritant to the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[8] and has been reported to cause Occupational Asthma.[9] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[10] TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[11] TDA and TDI are potential carcinogens.[12] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[13]

164.    As a direct and proximate result of Defendants' conduct, Plaintiff has been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

---

[7]   Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[8] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[9] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed Jun. 30, 2021).

[10] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[11] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*

[12] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[13] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

165.    As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

166.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

167.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiff, but the full extent of the injuries will not manifest until later in the Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

168.    Plaintiff demands judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays the Court to certify the Class and Subclass as defined hereinabove, to enter judgment against Defendants and in favor of the Class and Subclass, and to award the following relief:

1.      An order certifying this action and the Class and Subclass requested herein as a class action, designating Plaintiff as the representative of the Class and Subclass, and appointing Plaintiff's counsel as counsel to the Class and Subclass;

2.      An order declaring that Philips' actions constitute: (i) design defect strict liability; (ii) negligent design defect; (iii) breach of express warranty; (iv) breach of the implied warranty of merchantability; (v) fraudulent misrepresentation; (vi) fraud by omission; (vii) negligent misrepresentation; (viii) unjust enrichment; and (ix) a violation of the Connecticut Unfair Trade Practices Act; and that Philips is liable to Plaintiff and the Class and Subclass, as described herein, for damages arising therefrom;

3.      A judgment awarding Plaintiff and members of the Class and Subclass all appropriate damages, including punitive damages, in an amount to be determined at trial;

4.      A judgment awarding Plaintiff and the Subclass medical monitoring damages;

5.      A judgment awarding Plaintiff and the Class and Subclass prejudgment and post-judgment interest, as permitted by law;

6.      A judgment awarding Plaintiff and the Class and Subclass costs and fees, including attorneys' fees, as permitted by law; and

7.      Grant such other legal, equitable or further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff and the Class and Subclass demand a trial by jury on all issues so triable.

DATED:  November 18, 2021                    Respectfully submitted,


**LEVIN SEDRAN BERMAN LLP**

  _/s/ Sandra L. Duggan_
Sandra L. Duggan (PA Bar #56420)
Arnold Levin (PA Bar #02280)
Laurence S. Berman (PA Bar #26965)
Frederick S. Longer (PA Bar #46653)
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com
sduggan@lfsblaw.com
lberman@lfsblaw.com
flonger@lfsblaw.com

Nicholas A. Migliaccio
Jason S. Rathod
MIGLIACCIO & RATHOD, LLP
412 H Street, NE, Suite 302
Washington, DC  20002
Telephone: (202) 470-3520
Fax: (202) 800-2730
nmigliaccio@classlawdc.com

*Attorneys for Plaintiff*